# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07-CR-30089-MJR |
| ) | |
| KYLE KIMOTO, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### I. Introduction

The Government charged Kyle Kimoto with one count of Conspiracy, in violation of 18 U.S.C. § 371, one count of Mail Fraud, in violation of 18 U.S.C. § 1341, and twelve counts of Wire Fraud, in violation of 18 U.S.C. § 1343. A jury trial commenced on March 31, 2008, ultimately resulting in a guilty finding on all counts.

Now before the Court is Kimoto's March 25, 2008 motion to dismiss (Doc. 30), which is fully briefed. In this motion, Kimoto challenges the Government's right to maintain this prosecution in light of the Government's alleged failure to provide clearly exculpatory e-mails, failure to turn over FBI Agent Lawrence Wolfenden's report, inconsistent statements regarding the disclosure of discovery to the Postal Inspection Service and the alteration to a Bay Area Business Council ("BABC")[1] database. Kimoto asserts that the Government's actions denied him access to

---

[1] BABC is a fraudulent telemarketing business set up by Peter Porcelli who was charged with similar crimes in a separate indictment to which he plead guilty. He testified against Kimoto as part of a cooperating plea agreement.

1

relevant, exculpatory evidence. Thus, according to Kimoto, he has been deprived of his due process right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, **467 U.S. 479, 485 (1984)**. The Court took testimony, held a hearing on this motion on April 10, 2008 and took it under advisement. On April 16, 2008, the Court denied the motion[2] and now sets forth its analysis, as follows.

## II. Analysis of Motion to Dismiss

Kimoto moves for dismissal under the Due Process Clause of the Fifth Amendment and *Brady v. Maryland*, **373 U.S. 83 (1963)**, contending that the Government destroyed, or failed to provide the defense with beneficial digital forensic evidence and e-mails. Under *Brady*, the Government must provide to the defense all exculpatory evidence in its actual or constructive possession prior to trial. *Brady* material is evidence which is 1) exculpatory, 2) relevant to guilt or punishment, 3) favorable to the accused, and 4) within the actual or constructive possession of anyone acting on behalf of the State. *Brady*, **373 U.S. at 83**.

The Supreme Court addressed the Government's duty to preserve evidence in *Trombetta* and in *Arizona v. Youngblood*, **488 U.S. 51 (1988)**. The Court must assess Kimoto's right to relief, if any, in the light of these decisions. In *Youngblood*, the Court stated as follows:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of

---

[2]The motion was filed at the eleventh hour, six days before trial. Consequently, the Court was not able to prepare a detailed written analysis of its ruling but ruled in a short order without citing legal authority until the instant order could be drafted.

law.  ***Youngblood*, 488 U.S. at 58**.

In order to establish bad faith on the part of the Government, Kimoto must demonstrate "official animus" or a "conscious effort to suppress exculpatory evidence." ***United States v. Zambrana*, 841 F.2d 1320, 1341-42 (7th Cir. 1988)**.  In *Illinois v. Fisher*, **540 U.S. 544 (2004)**, the Court restated its position in *Youngblood* and added that the *Youngblood* holding applied not only to evidence that was "potentially useful," but also to evidence which was a defendant's "only hope for exoneration" and "essential to and determinative of the outcome of the case."  **540 U.S. at 548**.

The Supreme Court explained that a defendant must bear a heavy burden because of the "treacherous task" courts face in "divining the import" of the destroyed evidence.  ***Youngblood*, 488 U.S. at 57-58 (citing *Trombetta*, 467 U.S. at 486)**. The Court expressed itself as unwilling to read the "fundamental fairness" requirement of the Due Process Clause, as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.  *Id*.

In addition to bad faith, a defendant must show that the destroyed evidence would likely be of significance to his defense.  "To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." ***Trombetta*, 467 U.S. at 489; *United States v. Nesbitt*, 852 F.2d 1502, 1520 (7th Cir. 1988),** *overruled on other grounds, United States v. Durrive*, **902 F.2d 1221 (7th Cir. 1990);** *United States v. Watts*, **29 F.3d 287, 289-90 (7th Cir. 1994)(in addition to bad faith, a defendant seeking dismissal of a prosecution based upon destruction of evidence**

3

**must also show both that the exculpatory value of the evidence was apparent and that the comparable evidence could not be obtained by other reasonably available means**).

Kimoto contends that approximately 2500 missing e-mails were sent to or received by Peter Porcelli. According to Kimoto, of special importance are those sent by Porcelli to Alan Aronson on July 23, 2002, and August 6, 2002, which he alleges are exculpatory because they show a conspiracy between Porcelli and Aronson outside the presence or knowledge of Kimoto. Kimoto asserts that these e-mails have strong impeachment value against Porcelli, who stated under oath that he and his company were basically subsidiaries of Kimoto's. At oral argument, Daniel Libby, a computer forensics examiner, testifying on behalf of Kimoto, stated that he searched the entire data set and could not locate the Porcelli-Aronson e-mails. Mr. Libby also testified that, even if e-mails were deleted or purged, they could have been recovered if the acquisition of the computers had been done in a timely fashion, *i.e.,* as soon as possible. Kimoto maintains that the Government has or had possession of the e-mails and was obligated to provide them to the defense.

According to Kimoto, FBI Agent Lawrence Wolfenden stated that he conducted a complete digital examination and a full forensic extraction of the records at BABC. Doc. 30, Exhibit 1, ¶ 27, Sheets Affidavit. Kimoto maintains that Wolfenden stated that he sent all computer-related evidence, including "hard drives, tapes, cd's and dvd's," to Postal Inspector Floyd Adam Latham on or about April 6, 2006. *Id*., ¶¶ 28, 29. Kimoto asserts that this statement is contrary to the statement made by Latham that the only digital discovery he received from the FBI was in the form of CDs, which he copied in their entirety for Kimoto. *Id*., ¶ 24. Kimoto also asserts that Latham stated, "I do think the folder is not a complete copy of the disk." *Id*. Kimoto requested a copy of Wolfenden's Federal 302 report, which was completed on October 5, 2005, and which summarized

and documented his personal collection of evidence. *Id*., ¶ 35. Kimoto was referred to FBI Special Agent Kevin Klim who, according to Kimoto, first stated that the Postal Inspection Service had personally picked up all the evidence and later stated that Latham did not possess a copy of the report. *Id*., ¶¶ 36-41. Supervisory Special Agent Deanna Day, to whom Kimoto was then referred, did not return his phone call. *Id*., ¶ 41.

Lastly, Kimoto argues that the BABC database was altered and corrupted by the insertion, on March 16, 2007, of a table entitled "Latham-Unique Customer Records."

In sum, Kimoto asserts that he has been unable to obtain a complete forensic copy of the digital data extracted from BABC or Agent Wolfenden's report explaining it. Kimoto contends that, as a result, he was unable to locate the crucial, frequent e-mail communications. Kimoto also contends that the Government knew that the e-mails between Porcelli and Aronson were exculpatory and that, in any case, the Government had no authority to make this determination. Because of the Government's failure to provide the e-mails, Kimoto has been prejudiced in that he cannot properly offer the evidence in his defense and cannot adequately cross-examine Porcelli.

The Government responds that there is no evidence that BABC maintained an e-mail server on premises in its Tampa offices and that BABC may have purged its e-mail rather than maintaining it. Additionally, the Government contends that Porcelli appears to have used an internet e-mail account with Compuserve and may not have sent his e-mail through the BABC e-mail server. Furthermore, there was no need for the Government to explore the BABC computers' images, especially since Porcelli agreed to plead guilty almost immediately after indictment.

According to the Government, it outlined its entire theory of the case and the evidence it had to support it in an eight-hour PowerPoint presentation, provided open file discovery

and produced *Jencks* material[3] in the form of over two dozen video interviews with government witness, as well as hundreds of verification recordings, months in advance of trial. The Government argues that Kimoto fails to establish that any electronic evidence was destroyed by anyone except Assail, Inc.,[4] itself. The Government contends that open file discovery was allowed from the beginning and that "every scrap" of documentary evidence (hard drives, CD-ROM and other storage devices) have been and are available to the defense team.

The Government asserts that, assuming, *arguendo*, that the Government misplaced, lost or destroyed something during the transmission of evidence, Assail and BABC were businesses permeated with fraud. The verification recordings obtained by the Government exhibit a significant pattern of misrepresentation to consumers. The Government explains that it had no reason to believe that any collection of e-mail, to the extent that it could be found, would be contrary to the pattern of other evidence.

Lastly, the Government maintains that the addition of a table by Latham did not corrupt the BABC database. Rather, the Government provided Kimoto with its working files, and the imaged hard drives have always been available upon request.

---

[3] The Jencks Act was enacted in response to the Supreme Court's holding in *Jencks v. United States*, 353 U.S. 657 (1957) in order to ensure the meaningful confrontation of government witnesses. **U.S. v. Johnson, 200 F.3d 529, 534 (7th Cir. 2000)(citing 18 U.S.C. § 3500(b);** *see also* **FED.R.CRIM.P. 26.2;** *United States v. Lopez*, **6 F.3d 1281, 1288 (7th Cir. 1993))**. "The Act requires the government, upon the defendant's motion, to produce statements made by any of its witnesses which the particular witnesses signed, adopted, or approved, and which pertain to their testimony at trial." *Id*.

[4] Although not named as a defendant herein, Assail is the Utah telemarketing company allegedly owned and controlled by Kimoto.

Kimoto's assertions regarding the "missing e-mails" do not rise above the level of speculation. What emerges from the parties' submissions and from testimony is not a depiction of any animus toward Kimoto or any design or purpose to deprive him of exculpatory evidence but a singularly cooperative effort by the Government to apprise Kimoto of the case against him and to provide him with all relevant discovery.

As evidence of this cooperative spirit, Kimoto's computer forensics examiner, Daniel Libby, testified at oral argument that, when he received the original digital evidence on March 29, 2008, it was the first time in his career that the Government had produced original evidence to him. This accords with Assistant United States Attorney Reppert's representation that he has never been asked for and has never used a forensic image. Mr. Reppert also asserted that no forensic image was requested in this action until March 17, 2008.

Mr. Libby testified that there was nothing unusual in the way that the files, identified as "native" or "second generation," were first provided by the Government. Libby explained that a forensic image collects each bit and is a complete representation of original media. A secondary collection, such as he received, is the result of forensic acquisition and processing of that data. Libby testified that it was readily apparent that the files were not forensic images - and did not purport to be - but second generation files in which data was extracted by the original examiner and produced to agents in conjunction with their investigation. The Court notes that Kimoto's investigator, Robert Lawson, acknowledged that he had received the hard drive from Kimoto's counsel on November 1, 2007, and had been reviewing discovery an average of six hours a day. The files were also reviewed by Kimoto's counsel, Damian Sheets, who professed to be knowledgeable about computers. Given that it was "readily apparent" that the files were not forensic images,

7

Kimoto should have been aware well before March 17, 2008, that second generation files had been provided.

Kimoto's counsel represented that he can access nothing from the SOS data base because the links are broken. However, there is no basis to conclude that the Government knew that by disconnecting the computers it would be dismantling the network and destroying links that could not be recreated. Mr. Libby testified that agents executing a search warrant on site would not know in advance if computers were linked across the "internet backbone" and could not plan for that. Additionally, he testified that the agency is limited by the scope of the warrant, and a relational database could not be searched if it were not in the warrant.

Upon inquiry by the Court, Mr. Libby stated that the hard drives that were sent to him were not those taken from machines at the time the warrant was executed but the images that were copied onto the hard drives. Assistant United States Attorney Reppert represented that the original hard drives were probably returned and that the warrant language allows forensic images to be made. This representation is supported by the testimony of Latham who stated that the hard drives seized from Specialty Outsourcing Solutions ("SOS") were returned. Latham also testified that he received no forensic images from the Secret Service and that no computer evidence was destroyed. The Government cannot turn over material that is not in its possession. And the hard drives returned could have been the subject of subpoena so that they may have been available from their original owners separate and distinct from the Government.

There is no evidence that the e-mails were printed and retained rather than being purged or deleted. There is evidence, however, that Porcelli used Compuserve for his e-mail in place of or in addition to using the BABC e-mail server. If that were the case, the e-mails would

8

reside not on Porcelli's computer but on a central Compuserve computer - and again be subject to subpoena. Furthermore, even if the e-mails contained evidence of a conspiracy between Porcelli and Aronson, this does not preclude the possibility of a conspiracy between Porcelli and Kimoto. The Court questions the relevancy, and therefore the admissibility, of e-mails inculpating Porcelli and Aronson in a conspiracy claimed to be independent of the Kimoto-Porcelli conspiracy. Nor does the defense's showing of a conspiracy between Porcelli and Aronson, of which Kimoto had no knowledge, relieve Kimoto of his responsibility in the Kimoto-Porcelli conspiracy. One need not know all his co-conspirators in order to be guilty of conspiracy. Kimoto had written scripts and had a history as a telemarketer prior to his meeting with Porcelli.

There is no foundation to conclude that Jay Lankford, a principal of SOS, had copies of several hundred thousand complaints on hand when the Secret Service searched the facility. The Secret Service recovered thirty-three boxes of documents from SOS, all of which were made available to the defense. Additionally, the information Kimoto sought may have been available from another source, since the SOS server exchanged data on a daily basis with Assail's server in Kansas City, the offices of which were not raided.

Actions taken by Assail and Kimoto himself lend little credence to the argument that e-mails existed which were important and contained exculpatory evidence. The Assail information technology director, Charles Davidson, testified that he destroyed back-up tapes and e-mail, and Clifford Dunn testified that e-mails were purged and that Kimoto ordered his computer destroyed.

As to motive, the Court finds no bad faith, that is, no "conscious effort to suppress exculpatory evidence, " ***Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992)**, on the part of the Government with respect to Kimoto's allegations. Even if the e-mails had been preserved and were

9

lost or destroyed by the Government, the Court cannot infer bad faith because the exculpatory significance of the e-mails was not apparent, given the Government's theory of the case, as thoroughly outlined to Kimoto. ***Youngblood*, 488 U.S. at 56, n. 1 (citing *Trombetta*, 467 U.S. at 489) ("[T]he exculpatory value of the evidence must be apparent '*before* the evidence was destroyed' .... The presence or absence of bad faith ... for purposes of the Due Process Clause must necessarily turn on the [Government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (emphasis in original))**. That the Government invested the e-mails with little importance is made clear by the fact that in its eight-hour PowerPoint "reverse proffer," among the video clips, verification recordings, images of sales scripts and references to the law applicable to the case, only three e-mails were featured. Kimoto chose, possibly for strategic reasons, not to alert the Government to the nature of the information he was seeking, which was certainly reasonable and proper. However, it shows no bad faith on the part of the Government that it failed to perceive how this information could be material and relevant to any defense theory, even if such information had been in the Government's possession.

On the eve of trial, Kimoto made two other choices, also possibly for strategic reasons. First, Kimoto chose not to seek a continuance based upon Libby's eleventh hour revelations and the alleged discovery of a miscommunication regarding the computer files that were obtained by the Government during the investigation of Porcelli's programs (BABC and First American Leisure Card) and provided to Kimoto. Second, Kimoto filed the instant motion to dismiss.

Kimoto asserts that language contained in Latham's enclosure letter, sent to Kimoto with the external hard drive, caused him to believe that he had received a complete forensic image of all of Porcelli's computers and servers. According to Kimoto, when the miscommunication was

10

discovered, there was insufficient time remaining before trial for his expert to obtain and review the digital evidence. The Government agreed, albeit unwilling, not to oppose a motion to continue the trial setting. On March 27, 2008, Kimoto decided not to file a motion to continue but to file the instant motion to dismiss instead. The Court cannot recall a time (although the Court's memory is far from faultless) when it did not grant a continuance where, as here, it would have been requested by the defense and the Government indicated it would not object. Thus, Kimoto elected to forgo the opportunity to have his expert obtain and review the information which he now contends is so crucial to his defense.

As to the belated motion to dismiss, the Court notes that Kimoto was indicted on June 20, 2007, and that jury trial was initially set for August 27, 2007. The Court granted two motions to continue trial filed by Kimoto, first continuing trial to February 4, 2008, and then to March 31, 2008. The Court carefully reviewed Kimoto's third motion to continue trial and concluded that there was no valid reason for continued delay and that granting a third continuance would not serve the public's interest in a speedy trial. *See* Order at Doc. 21. Kimoto had nine months to prepare for the current case and an additional nine months preparation time for the civil enforcement action. ***See FTC v. Assail, Inc., 410 F.3d 256 (5th Cir. 2005)***. In the Court's Order, it observed that Kimoto did not suggest that the Government had failed to provide him with necessary discovery materials. *Id*. Indeed, as described by Kimoto, the problem was that so much discovery had been provided that counsel had "only been able to scratch the surface of the digital documentation." *See* Doc. 18, p. 4. In the opinion of the undersigned district judge, Kimoto should have raised the problem of which he

now complains much earlier than three business days prior to the start of trial.[5] This opinion comports with the testimony of Mr. Libby, *supra*. If a forensic image were required, and it was immediately apparent that a second generation image had been provided, there was no reason to wait until March 17, 2008, to request the forensic image. Indeed, Kimoto did not retain Libby until March 10, 2008 - just three weeks before trial - making his handiwork likely impossible given the pending trial date of March 31, 2008.

The Government allowed open file discovery and sent to defense counsel a 500-gigabyte hard drive loaded with eight of eleven CDs and DVDs, which included, in the Government's estimation, all of the material that underlay its case. According to testimony by Postal Inspector Latham, thirty-three boxes of evidence, seized from SOS, were made available to Kimoto; hard drives seized from SOS were returned. In the absence of an articulated request, the Government had no further obligation.

Finally, the Court cannot conclude that Latham's addition of a table, the only evidence of alteration pointed out by Kimoto, corrupted the BABC database. Libby testified that Latham was working in secondary files that were copied for him and that it was not unusual to copy another table within the same data base. He testified that this did not corrupt the file and that there was no attempt to mislead because the table was labeled as the Latham file.

The Court has herein articulated its reasons for its April 16th Order denying Kimoto's Motion to Dismiss (Doc. 46). Kimoto failed to establish that the Government intentionally withheld electronic evidence for the purpose of depriving him of the use of that evidence during his trial.

---

[5]The Court's CM/ECF system shows that defense counsel entered the motion to dismiss on March 25, 2008, at 4:02 P. M. (CDT).

Specifically, Kimoto failed to show bad faith on the part of the Government, failed to show that the exculpatory value of the evidence was apparent and failed to show that he could not have obtained comparable evidence by other reasonably available means.  *See Watts*, **29 F.3d at 289-90**.

**IT IS SO ORDERED.**

**DATED this 8th day of May, 2008**

                                                    **s/Michael J. Reagan**
                                                    **MICHAEL J. REAGAN**
                                                    **United States District Judge**