**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 07-CR-30089-MJR ) |
| KYLE KIMOTO, | ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### I. Introduction and Procedural Background

On June 20, 2007, the Government charged Kyle Kimoto with one count of Conspiracy, in violation of 18 U.S.C. § 371, one count of Mail Fraud, in violation of 18 U.S.C. § 1341, and twelve counts of Wire Fraud, in violation of 18 U.S.C. § 1343.[1] A ten-day jury trial commenced on March 31, 2008, before the undersigned District Judge. The trial culminated on April 18, 2008, with jury verdicts of guilty on all fourteen counts against Defendant Kimoto. (Docs. 33-53).

Kimoto timely filed a motion seeking either a judgment of acquittal or a new trial (Doc. 58). The Government timely filed a response opposing Kimoto's post-trial motion on April 29, 2008 (Doc. 59). Kimoto's reply was filed May 7, 2008 (Doc. 65). The post-trial motion having been fully briefed, the Court now rules thereon, beginning with a factual overview and a reference to the legal standard governing these motions.

### II. Summary of Facts

---

[1] At trial the government abandoned its claims under 18 U.S.C. § 1342 and 18 U.S.C. §§ 1956(a)(1)(A)(I) and 1957.

The indictment alleged that Kyle Kimoto and his primary operating company, Assail Inc., with Peter Porcelli and a variety of corporations, engaged in a fraudulent telemarketing scheme. Consumers with poor or no credit were led to believe that, in exchange for an advance fee, they would receive a pre-approved MasterCard or Visa credit card with a credit limit. Rather than receiving a credit card, consumers generally received either an application for a Stored Value MasterCard (a form of debit card) or an unusable plastic card that looked like a MasterCard credit card emblazoned with the MasterCard logo. As a fee for providing this card[2], Kimoto and his co-conspirators debited each consumer's account $159.99 or more, processing several million dollars in electronic debit charges against consumers' bank accounts. Neither Visa nor MasterCard authorized Kimoto to market credit cards on its behalf, and no consumer received a credit card. Kimoto and his co-conspirators also made it extremely difficult for consumers to cancel recurring charges and obtain refunds. Use of the Stored Value MasterCard was also misrepresented in that purchasers were led to believe that using it would improve their credit scores.

### III. Applicable Legal Standards

**FEDERAL RULE OF CRIMINAL PROCEDURE 29(c)** governs motions for judgment of acquittal made following a jury verdict. A motion for judgment of acquittal should be granted only where there is insufficient evidence to sustain the conviction. ***U.S. v. Galati***, **230 F.3d 254, 258 (7th Cir. 2000);** ***United States v. Jones***, **222 F.3d 349, 351-52 (7th Cir. 2000).**

In considering the sufficiency of the evidence, the Court views the evidence in the light most favorable to the Government and overturns a conviction only "if the record contains no evidence

---

[2]The "package" marketed by Kimoto also included vacation discounts and a long distance telephone discount. Little was said at trial by either side regarding these items. From the little information available about them, the Court believes their value was illusory.

on which a rational jury could have returned a guilty verdict." *U.S. v. O'Hara*, **301 F.3d 563, 569-70 (7th Cir. 2002).** *Accord United States v. Duprey*, **895 F.2d 303, 310 (7th Cir. 1989)(evidence and inferences are viewed in the light most favorable to the government)**. Additionally, in assessing the sufficiency of the evidence, the Court may not re-weigh the evidence or judge the credibility of the witnesses. "As long as there is a reasonable basis in the record for the jury's verdict, it must stand." *Galati*, **230 F.3d at 258 (citing** *Dallis v. Don Cunningham & Assocs.*, **11 F.3d 713, 715 (7th Cir. 1993)).**

Unlike motions for judgment of acquittal made following a jury verdict, a different standard governs motions for new trials in criminal cases. **Federal Rule of Civil Procedure 33** provides that, upon a Defendant's motion, the Court may vacate any judgment and grant a new trial, "if the interest of justice so requires." As explained by the United States Court of Appeals for the Seventh Circuit, "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, **468 F.3d 428, 436 (7th Cir. 2006) (citing** *United States v. Berry,* **92 F.3d 597, 600 (7th Cir. 1996)).** The district court may consider the credibility of the witnesses in making this determination. *United States v. Washington,* **184 F.3d 653, 657 (7th Cir. 1999).** But the district court may <u>not</u> reweigh the evidence or set aside the verdict just because the court "feels some other result would be more reasonable." *United States v. Reed*, **875 F.2d 107, 113 (7th Cir. 1989).** Rather, the evidence must preponderate so heavily against the verdict that it would be a miscarriage of justice to let the verdict stand. *Id.* Stated another way, the focus in a new trial motion is on whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses. *Id.* Additionally, the Seventh Circuit has warned that when considering a motion for new trial, "Courts are to grant them

sparingly and with caution, doing so only in those really 'exceptional cases.'" ***Id. Accord United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir. 1993) (explaining that motions for new trial must be approached with great caution and that judges should be wary of second-guessing determinations made by juries).**

In the case at bar, having carefully reviewed Kimoto's motion, the Court concludes that neither a judgment of acquittal nor a new trial is appropriate. The Court addresses each of the multiple grounds, taking them in the order of Kimoto's allegations.

### IV. Analysis

#### A. Motion for Judgment of Acquittal

Kimoto contends that the evidence at trial was legally insufficient to sustain a conviction for Conspiracy to Commit Money Laundering,[3] Wire Fraud or Mail Fraud. Essentially, Kimoto makes four arguments in support of this thesis, as follows. First, Kimoto argues that the Government failed to present any evidence to establish that a conspiracy existed beyond a reasonable doubt. Instead, Kimoto asserts that several of the Government's exhibits acted to prove the absence of any specific intent to defraud or deceive, and there was extensive testimony that Kimoto had "zero tolerance" for any misrepresentation even though some misrepresentation in the telemarketing industry is unavoidable. Second, Kimoto argues that the Government failed to prove that he had "knowledge" as is required for a conviction on any of the Counts in the indictment. Specifically, according to Kimoto, (1) there was no testimony which would show that he knew that the scripts were

---

[3]The Government chose not to instruct the jury on the specific charge of conspiracy to commit money laundering and abandoned that claim. The conspiracy charge in Count I of the indictment was limited to mail and wire fraud. *See* Doc. 51, Jury Instructions. Therefore, the Court will consider Kimoto's contentions as to those charges.

misleading or that customers felt misled; and (2) there was no evidence that he did anything other than spending vast amounts of money on refunds, ensuring triple checks for compliance and focusing on keeping the consumer happy. Third, Kimoto contends that the Government offered no proof of any acts in furtherance of the conspiracy. In support of this contention, Kimoto states that the jury's verdict was contradictory in that its finding as to paragraph B is contradictory to its finding as to paragraph A.[4] Fourth, Kimoto argues that the Government's failure to produce the exhibits to the *Jencks* material, which contradicted Mr. Howard's testimony, prejudiced him by preventing adequate cross examination and impeachment of Mr. Howard.

"Challenging the sufficiency of the evidence is an uphill battle," in which "the defendant bears a heavy burden." ***United States v. Wallace*, 212 F.3d 1000, 1003 (7th Cir. 2000).** As to Kimoto's argument that the Government failed to present any evidence to establish that a conspiracy existed beyond a reasonable doubt, the Government easily wins the battle. "Where 'two or more persons conspire ... to commit any offense' under Title XVIII of the United States Code 'one or more of such persons [who commit] any act to effect the object of the conspiracy' may be held criminally liable therefor under 18 U.S.C. § 371." ***United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003)**. Here, the indictment clearly and correctly alleged that Kimoto, Porcelli, various business enterprises and others known and unknown, unlawfully, willfully and knowingly devised a scheme to obtain money through false pretenses and committed specified overt acts in furtherance of the conspiracy. Porcelli, although not a co-defendant, was separately indicted for conspiracy regarding the same scheme as Kimoto, pled guilty and testified at trial as a cooperating government

---

[4]This complaint refers to special findings made by the jury associated with Count I, conspiracy, and the Government's alleged overt acts.

witness. Porcelli's testimony, taken in conjunction with that of Kimoto's employees, Clifford Dunn, Assail's vice president and manager of its St. George, Utah, office, and Tully Herd, an Assail account manager, provides ample evidence that a conspiracy existed to mislead consumers and that Kimoto was a part of that conspiracy. Porcelli testified that Kimoto intended to sell a debit card as a credit card as follows:

> Q. ...[C]an you tell us how this product was sold?
> A. It boils down to that you are leaving the unmistakable impression in the customer's mind they are going to get a credit card.
> Q. That was the intent of the program, to create that impression. Is that true?
> A. That was the way he [Kimoto] told me it had to be sold and I went along with it.

Porcelli (4/2/08) 25:11-18; *see also* 15:15-16:9.

Herd testified that he was familiar with programs sold by Assail - Advantage Capital, Capital First and Premier One - and had worked as a telemarketer selling "one or two" of those programs. Herd, 20:4-10. According to Herd, the scripts that were used by Assail on these programs were "very similar to the scripts used by Bay Area Business Council and American Leisure Card." *Id.* 20:11-15. He agreed that the essential thrust of these programs was "to create the impression in the mind of the consumer that their application for credit card had come home, had been approved and that they were going to get a Master Card credit card...." *Id.* 20:16-21.

Dunn testified that the scripts for the various companies were substantially the same. Dunn, 121:3-6. When asked if all of the scripts were "crafted to create the impression that the consumer was going to get a credit card," Dunn responded, "Visa or MasterCard credit card." *Id.* 121:7-9. Dunn testified that the design of the sales scripts and the basis of the whole program was to create the impression that the consumer was being offered a credit card when, in fact, what was being provided was "a stored value card that did not have any credit value already on it." *Id.* 122:17-123:1.

The testimony of these witnesses is compelling evidence upon which the jury could conclude that a conspiracy existed to mislead consumers into believing that they would get a credit card and that Kimoto was a part of the conspiracy.

Kimoto's contention that he is not guilty because he had "zero tolerance" for misrepresentation made during verification fails because the scripts themselves are fraudulent on their face. *See F.T.C. v. Bay Area Business Council, Inc.*, **423 F.3d 627, 635 (7th Cir. 2005)("One look at the scripts used by telemarketers for BABC and American Leisure confirms that the corporate defendants misled reasonable consumers into believing they would receive a credit card.")**. Thus, Kimoto's contention that he did not tolerate going "off script" does not serve as a defense to the indictment.

Nor does the evidence support Kimoto's contention that there was no testimony that he knew that the scripts were misleading. Porcelli testified that Kimoto deliberately set out to mislead consumers through the scripts. The following exchange occurred during Porcelli's first meeting with Kimoto:

> Q. What was [Kimoto's] response to that?
> A. [Kimoto] leaned toward me and he said you have no idea how this has to be sold.... He said this has to be sold as a credit card. The people have to see it as a credit card and what you say is nice but it doesn't cut it....
> Q. [C]an you tell me whether or not it was your understanding that Assail was proposing to sell a debit card as if it were a credit card?
> A. Well, naturally, I had questions. I said, hey, what happens when you tell somebody that they are going to get a credit card and we end up sending a debit card there.... Kyle said let me break down for you what happens.... I am going to give you the psychology of what happens with a customer.... The way to get them to pay for it is to make your product more important in their mind than anyone else who calls that day and the only way they are going to have the money ready for you, you make sure they know what they are getting from you. These people are so weak on the phone, these customers are so - I don't want to use the word vulnerable, but so easy to sell.... Porcelli (4/2/08) 14:18-16:11.

The Government's argument that Kimoto intended to mislead consumers is bolstered by
Herd's testimony, as follows:

> Q. As a matter of fact the whole premise of this, of the sales, you would agree with me, was to mislead the consumer to believe they were getting a credit card, not to make outright misrepresentation that they were getting a credit card. Isn't that correct?
> A. Yes.
> Q. So if a consumer was actually told you are going to get a credit card, that was not a representation that was supposed to be made. Isn't that right?
> A. Yes.
> Q. But those representation[s] were made, correct?
> A. Uh huh. Herd, 35:15-36:1.

Viewing this evidence and the inferences which can be drawn from it in the light most favorable to the Government, a rational jury could have concluded that Kimoto and his co-conspirators intended to deceive consumers.

Moreover, contrary to Kimoto's assertions, he did tolerate misrepresentations made by telemarketers during verifications. During Herd's testimony, he read the following excerpts from a verification transcript into the record:

> Q. Could you read [the excerpt from the transcript] please?
> A. (Manager) Can you give me a reason why you don't want it? (Customer) Because for some reason you won't let me not do it....
> Q. What is the manager's response to the customer saying I don't want to do it?
> A. Okay, you do understand we have to put a derogatory mark on your credit report for denying our card.
> Q. And the customer?
> A. I do. Really, go ahead.
> Q. Let's look at the second excerpt. Would you read that please?
> A. It says (Manager) Okay, you do understand if you cancel you will never be getting any offers from MasterCard again....
> Q. Now what is the manager's response to the customer saying that they are going to hang up?
> A. Okay you will not receive any more offers from MasterCard. Herd, 46:16-47-25.
> \*       \*       \*
> Q. You knew at the time you were the account manager you listened to a lot of verification report[s].... You knew at the time there were a lot of customers who

> indicated through listening to the verification recording that they thought this was a credit card. [The] verifier would simply go with it, wouldn't correct them....Isn't that correct?
> A. Yes. Herd, 84:15-22.

The Government then played a two-minute excerpt of Herd's video interview, taken under oath by a postal inspector, on the issue of Kimoto's tolerance for misrepresentation.

> Q. You indicated that there was some sort of balance you needed to keep as an account manager?
> A. Well you've got to keep revenue up. Of course, that is the goal of any kind of corporation is to make money or sales.... So you reteach... You go back over the scripts with the rooms time and time again ... but you don't ever really get rid of [a] room no matter how bad they misrepresent. It takes a lot to actually ever really cut a room....
> Q. So this was not exactly zero tolerance approach?
> A. No, not in any way, shape or form. Herd, 90:13-91:20.

Testimony by Herd made it very clear that misrepresentation was tolerated, especially in rooms that were making higher revenue, or as Herd phrased it, "But like anything else, money talks and the more money you make, the more you get away with[.]" *Id.* 91:25-92:1-6.

The Court must assume that the jury credited Porcelli's and Herd's testimony on these issues rather than any contrary testimony elicited by the defense. *See Jackson v. Virginia*, **443 U.S. 307, 318-319 (1979)**. Viewing the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact, in resolving conflicts in the evidence, weighing the evidence and drawing reasonable inferences from the evidence, could have concluded that Kimoto engaged in a scheme to mislead consumers to believe that, for a fee, they would be provided with a credit card and were instead provided with an application for a debit card. *See id.* **at 319**.

Kimoto contends that the Government offered no proof of any overt acts in furtherance of the conspiracy. Kimoto asserts that this "can clearly been seen" in the jury's "contradictory verdict" as to paragraphs A and B regarding Count I of the indictment. *See* page 2 of Doc. 53, Jury

Verdicts. Kimoto's contention is wholly conclusory and baseless. The paragraphs in question are as follows:

> A. Kimoto developed a sales model for the sale of a MasterCard Stored Value Debit Card as a credit card and targeted consumers with bad or no credit, who had applied for and had been turned down for a credit card.
>
> B. Kimoto put together an international network of "affiliates," call centers which made unsolicited telephone calls to consumers, including consumers in the Southern District of Illinois, utilizing the marketing plan and sales scripts developed by Kimoto.

The jury found beyond a reasonable doubt that Kimoto had committed the overt acts alleged in paragraph B but not in A. First, the paragraphs at issue do not allege the same overt acts and thus are not facially contradictory. Second, if Kimoto thought that the paragraphs were contradictory, he had ample opportunity to raise this issue prior to the verdict, which he did not. Third, the answers are internally consistent and are not inconsistent with the general verdict. *See* ***Turyna v. Martam Const. Co., Inc*., 83 F.3d 178, 181 (7th Cir. 1996) (citing FED. R. CIV. P. 49).** In point of fact, any combination of "yes" or "no" answers to these two questions could be consistent because each alleges separate and distinct facts. The Government was not required to prove beyond a reasonable doubt that Kimoto had committed *all* of the enumerated overt acts but only that he had committed "*any* act to effect the object of the conspiracy." ***Hausmann*, 345 F.3d at 955 (emphasis added)**. The jury specifically found that the Government had proven beyond a reasonable doubt that Kimoto had committed four overt acts in furtherance of the conspiracy, which is more than sufficient to support their verdict. *See* paragraphs B, C, E and H of Doc. 53, jury verdict form.

Lastly, Kimoto contends that the Government's failure to produce the exhibits to the *Jencks* material, which contradicted Roger Howard's testimony, prejudiced Kimoto by preventing him from adequately cross-examining and impeaching Howard. Kimoto's argument, here, is sketchy at

best, in that he does not even identify what material the Government allegedly failed to produce that would have contradicted Howard's testimony. However, Kimoto raises this issue more fully below in his argument for a new trial. Considering together Kimoto's argument, below, and the Government's response to the motion for judgment of acquittal presently *sub judice*, the Court gleans that Kimoto refers to an exhibit to the deposition of James Sierra.

As the Government correctly points out, Kimoto's argument is more correctly brought under ***Brady v. Maryland*, 373 U.S. 83 (1963)** rather than under ***Jencks v. United States*, 353 U.S. 657 (1957)**. Sierra, although on the Government's witness list, was not called because the Government believed that his testimony overlapped Howard's testimony.

Before Kimoto would be entitled to a judgment of acquittal (or a new trial) under *Brady*, he must establish: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." ***United States v. Morris,* 80 F.3d 1151, 1169 (7th Cir. 1996) (citations omitted)**. Even assuming, *arguendo*, that the evidence was favorable and material, Kimoto's argument fails. The Government did not suppress this evidence because it was available to Kimoto through the exercise of reasonable diligence. ***See id.* at 1170 (citations omitted)**.

The material at issue is an exhibit to Sierra's deposition taken by the Federal Trade Commission in ***F.T.C. v. Assail, Inc.,* W03CA007 (W.D. Texas 2003)**. *See* Doc. 59, Exhibit A. In this FTC action, the District Court for the Western District of Texas issued an order to show cause why Respondents, Kimoto, Draskovich and others, should not be held in contempt of court for violation of the court's preliminary injunction order. *Id.* Exhibit B. The court determined that Respondents, Kimoto, Draskovich and one other, had violated the preliminary injunction order and

were in contempt of court. *Id*. Exhibit C. The three Respondents were ordered to be taken into custody and not released until they had purged themselves of contempt or posted $100,000 bond. *Id*. Ultimately, the final monetary judgment as to Kimoto and Assail was entered in the amount of $105,706,000.00. *Id*. Exhibit F.

The Fifth Circuit affirmed the decision of the lower court in ***F.T.C. v. Assail, Inc.*, 410 F.3d 256 (5th Cir. 2005)**. The Fifth Circuit noted that Kimoto retained Draskovich on January 16, 2003, to defend him in the FTC's complaint, which charged a telemarketing scheme in violation of § 5(a) of the Federal Trade Commission Act, and in any potential criminal action. **410 F.3d at 259-60**. The Fifth Circuit determined that the $210,000 fee paid by Kimoto to Draskovich was subject to the initial asset freeze order that the lower court placed on Kimoto's assets. *Id***. at 260**.

The above discussion shows that Kimoto's counsel of record in the current matter, Robert Draskovich, was also Kimoto's counsel of record when Sierra's deposition was taken on February 12, 2004, and, the Court would assume, was vigorously defending Kimoto's interests. Although neither Kimoto nor Assail appeared for this deposition, counsel for Assail's officers, Mike Henriksen and Joel Best, appeared by telephone. On the other hand, notably absent from this litigation was the Department of Justice, which prosecuted the current action. *Assail* was prosecuted by the FTC, an independent administrative agency with the ability to litigate in its own name in district court.

In sum, the exhibit to the deposition that Kimoto claims was suppressed by the Government was in his own hands and those of his attorney and only subsequently obtained by the Department of Justice or the United States Attorney's Office. It is not the Government's responsibility to search the record of a civil case in which Kimoto was represented by the selfsame

attorney who represents him herein in order to hand him an exhibit on a silver platter.

In sum, the Court finds that there is a reasonable basis in the record for the jury's verdict, and, accordingly, it must stand. *See Galati,* **230 F.3d at 258 (citation omitted)**.

**B.    Motion for new trial**

Kimoto moves for a new trial based on the Government's alleged continued failure to produce complete digital evidence, destruction of exculpatory physical evidence and failure to provide *Jencks* material.

The Court exhaustively considered the issue of the Government's alleged failure to preserve and provide physical and digital evidence in its May 8, 2008 Order denying Kimoto's motion to dismiss. Order, Doc. 66. Kimoto again advances "the same reasons articulated in the Defense's motion to dismiss...." More specifically, Kimoto first rehashes his argument that he was unable to present an adequate defense at trial because the Government destroyed or failed to produce pallets of documents. These documents, along with hard drives, computers and servers, were allegedly seized from Specialty Outsourcing Solutions ("SOS")[5] by agents of the United States Secret Service and the Internal Revenue Service Criminal Investigative Division. Kimoto asserts that of 800,000 physical documents taken from SOS, the Government produced only 4,600.

Jay Lankford, a partner in SOS, testified that the United States Secret Service seized pallets of business-related documents, computers and hard drives from SOS. Lankford (April 3, 2008) 137:16-25; 138:15-18. The computers and hard drives were returned but not the documents. *Id*. 10-14. Lankford did not, however, testify that all of the records seized were Assail customer inquiry

---

[5]SOS handled customer service for Assail's programs, including Premier One, Capital First and Advantage Capital.

forms or that all of the documents generated in the year-and-a-half relationship between Assail and SOS were retained. Rather, Lankford testified that the pallets of information contained internal working documents, payroll and accounting documents. *See id.* at 138:1-7. When asked if he was aware of how many documents were at SOS, Lankford responded, "No, sir. Couldn't tell you." *Id*. 138:8-10.

Without citation to the record, Kimoto asserts that Lankford "specifically testified" that approximately 8,000 handwritten documents were "produced[d] on a daily basis" and that they were preserved utilizing methodology consistent with the relative handful at trial. Lankford testified that between 6,400 and 8,000 complaining customers called each day (*Id*. 89:7-10), but he did not testify that every call was notated in writing. He stated, rather, that the calls "should have been" notated but "it was updated and you hoped it was updated in the system as well. *Id*. 219:25-220:3. A careful review of the transcript provides no support for Kimoto's conclusory assertion that all handwritten documents were preserved utilizing a methodology consistent with the documents offered at trial. There is no testimony that supports Kimoto's assertion that the Government actually destroyed nearly 800,000 documents.

According to the testimony of Postal Inspector Floyd Adam Latham at the hearing on Kimoto's motion to dismiss, the Secret Service seized thirty-three boxes of documents from SOS, all of which were made available to the defense. Latham also testified that hard drives seized from SOS were returned and that no computer evidence was destroyed.

In sum, Kimoto's chain of assertions simply does not link up. There is no evidence that SOS had nearly 800,000 handwritten customer inquiry forms on its premises when the federal agents executed their search warrant or that, if present, the documents were actually seized by the

agents or, if both present and seized, that the documents were destroyed.

Moreover, Lankford testified that Assail had a server in Kansas City to which the SOS system periodically uploaded. *Id*. 153:23-154:3. He further testified that files went into a database that SOS updated daily as they were taking phone calls and that database merged with the Assail database in Kansas City. *Id*. 197:22-25, 198:1-5. According to Lankford, SOS thought that Assail addressed everything that SOS was noting in the system and uploads. *Id*. 198:16-25. Thus, the documents at issue were available to Kimoto on a database linked to the SOS system in Assail's Kansas City offices, which were not raided.

Finally, Kimoto provides no objective reason to believe that the documents would have been helpful to him. SOS fielded consumer complaints, about which Lankford testified, that, given the type of program, the complaints that SOS received were from "people that are very hot, that are angry, that believe they have been lied to, misrepresented, that what they were told they were going to get was a Visa or MasterCard credit card[.]" Lankford (4/4/08) 125:19-126:1. Dunn testified that the common theme of most complaints received by SOS was that the consumer had been promised a credit card and had not received one. Dunn 130:3-9. Dunn agreed that, generally, consumers complained about the "pay-as-you-go" feature. *Id*. 130:10-12. SOS's rebuttals to consumer complaints were more in the nature of reselling the product rather than traditional customer service. *Id*. 131:11-12. According to Dunn, the pattern of customer complaints received by SOS escalated, with six customer representatives growing to 100, who were constantly having "F bombs" thrown at them, and all dealing with the same type of call and often the same caller. *Id*. 132:11-23. Dunn testified that this was "almost the entire pattern of the relationship," such that the one call from a happy customer was so unusual, "literally noteworthy," that Dunn wrote it down in his daily report

to Kimoto and Joel Best, Assail vice president. *Id*. 137:14-25, 138:1-9. After Dunn thought about this "happy customer" for a while, he began to wonder if the person who reported this "hero story" to him had actually not gotten this call and was, possibly, pulling his leg. *Id*. 138:12-22. In light of the pattern and tenor of calls received at SOS, it seems in the highest degree unlikely that the documents at issue, even if they had existed and been seized, would have been exculpatory.

There is also evidence that Kimoto ordered and participated in the destruction of documents and digital evidence. Doc. 59, Exhibit G. For example, he ordered Dunn to get rid of his computer on the day the search warrant was served at SOS. Dunn (4/4/08) 127:20-25. At the April 10, 2008, oral argument on Kimoto's motion to dismiss, the Assail information technology director, Charles Davidson, testified that he destroyed back-up tapes and e-mail. Kimoto also conducted "burn parties," according to the sworn statement of Joel Best, taken on May 21, 2007. Doc. 59, Exhibit G. Best stated that "tons" of papers packed into a duffle bag and "a suitcase full of documents" were burned. *Id*.

The Court thoroughly addressed Kimoto's contentions, now raised again, regarding the production of digital evidence "less than forty-eight hours before trial" in its May 8th Order denying Kimoto's motion to dismiss. *See* Order, Doc. 66. First, Kimoto's computer forensics examiner, Daniel Libby, testified at the April 10, 2008 oral argument, that the manner in which the files were originally produced was not unusual and that when he received the original digital evidence on March 29, 2008, it was the first time in his career that the Government had produced original evidence to him. Assistant United States Attorney Reppert represented to the Court that he has never been asked for and has never used a forensic image. Mr. Reppert also asserted that no forensic image was requested in this action until March 17, 2008. Indeed, Kimoto did not retain Libby until March

10, 2008, making it likely impossible for him to complete a digital examination and to process every piece of digital evidence, given the pending trial date of March 31, 2008.

Second, there is a lengthy and unexplained gap between the date on which Kimoto's investigator, Robert Lawson, received the hard drive at issue - November 1, 2007 - and the March 17, 2008, request for a forensic image. Lawson stated that he had been reviewing discovery an average of six hours a day; additionally, Kimoto's counsel, Damian Sheets, who professed to be knowledgeable about computers, reviewed the files. Yet, Libby testified that it was readily apparent that the files were not, and did not purport to be, forensic images. If forensic images were needed, there was no reason to wait approximately four-and-one-half months, until two weeks prior to trial, to make that request. Additionally, as the Court has previously observed, Kimoto had nine months to prepare for the current case and an additional nine months preparation time for the civil enforcement action. *See Assail,* **410 F.3d 256**.

Finally, it was Kimoto's decision not to seek a continuance, based upon the alleged discovery that the Government had not provided forensic files and the alleged miscommunication regarding the computer files provided to Kimoto from the Government's investigation of Porcelli's programs. The Government agreed not to oppose a continuance and, as the undersigned judge stated in his May 8th Order, he cannot recall a time when he did not grant a motion to continue under similar circumstances. Thus, Kimoto elected to forgo the opportunity to have his expert obtain and review the information which he now contends entitles him to a new trial.

Kimoto's final argument for a new trial is that the Government's failure to produce the exhibits to the *Jencks* material prevented him from properly impeaching Howard. The Court fully considered and rejected this argument, *supra*.

In sum, the Court finds that the verdict is consistent with the manifest weight of the evidence, taking into account the credibility of the witnesses, and that this not the "exceptional case" in which a motion for new trial should be granted.  *See Reed*, **875 F.2d at 113**.

### V. Conclusion

For all of these reasons, the Court **DENIES** Defendant's renewed motion for a judgment of acquittal and motion for a new trial (Doc. 58).

**IT IS SO ORDERED.**

**DATED this 27th day of May, 2008**

                                            s/Michael J. Reagan
                                            **MICHAEL J. REAGAN**
                                            **United States District Judge**